Good afternoon, Illinois public court first district court is now in session, the sixth division, the Honorable Justice Mary l make for presiding case number 19 dash 0364 people versus war. Good afternoon console. Before we begin timing, either one of you would each of you please state your name beginning with the appellant and appellant, please let us know if you would like to reserve any of your 20 minutes for rebuttal. Thank you, Your Honor. Yes, this I'm Jennifer von Traeger from the office of the state appellate defendant defender for the appellant Mikhail Ward. And yes, I would like to reserve a few minutes of my time for rebuttal. Can you can you define if you, I'll take three minutes, Your Honor, I'm sorry. That's right. That's good. Also, good afternoon, Your Honors Miss bone Trager, my name is David is coach and I'm the county state's attorney on behalf of the people. Okay. All right. Also for the appellant whenever you're ready, maybe. Certainly Good afternoon, Your Honors, and may it please the court. Again, I'm Jennifer bond Trager for the appellant Mikhail Ward. As Your Honors are undoubtedly aware there are seven substantive issues in the briefs, and unless Your Honors would prefer otherwise I planned to focus on the second issue in the briefs, addressing the motion to suppress Mr words confession. Your Honors, Mr word unequivocally invoked his right to remain silent, and the police failed to scrupulously honor that invocation. He told the detectives, I ain't got nothing else to say, but detectives did not honor that invocation, and instead reinitiated the interrogation 80 minutes later, and they did so without giving a fresh set of Miranda warnings. This happened twice more before the police ultimately elicited an inculpatory statement from Mr ward. This division's recent decision in people versus Javier Cox is directly on point in Cox, the defendant invoked his right to remain silent by telling police he no longer wanted to speak with them. And although the interrogation initially ceased the police returned some hours later, and reinitiated the interrogation, and they did so without providing a fresh set of Miranda warnings. This court found that the police had failed to scrupulously honor the defendants invocation of his right to remain silent, and found that the. Would you like to respond to the brief which I'm sure you saw that we just allowed the brief, the state to file, suggesting that if the statements were admitted, it was in there, it was harmless. Certainly, the improper admission of the inculpatory statements was certainly not harmless beyond a reasonable doubt courts consistently find that the improper admission of an inculpatory statement is rarely harmless error courts can characterize it as a rare circumstance in which that will be the case, a confession carries powerful weight with juries courts often say that it is the most powerful evidence the state can introduce against a defendant, and it undoubtedly had that effect in this case. Where we have tentative identifications following wildly varying descriptions of the shooter in circumstances that did not allow for the eyewitnesses to to get a good look at the at the offender. Statements by awards friends that were recanted each of those young men said that they were threatened with parole and probation violations and they ultimately went along with what police wanted them to say in order to be released and not have their parole or probation violated. And then there's no other really concrete or reliable evidence beyond that. So I don't think the state can establish beyond a reasonable doubt that the improper introduction of the statement was harmless. And so, because of that and following Cox and Flores and the other cases before those this court should reverse and remand for a new trial at which word statement is not admissible. If we were to do that, which of your other seven issues. Certainly the sufficiency argument for double jeopardy purposes. Beyond those your honors. While some of them are interesting. It's entirely up to your honors. I'm sorry. I said they're all interesting. But it's otherwise entirely up to your honors discretion, what your honors believe will recur on retrial. And if you don't have no other questions, I'm happy to reserve the remainder of my time for rebuttal. I do have a question. Miss. Is it. So, you've raised the constitutionality of the investigative alert and the way it's been briefed it's, you know, fairly minimal briefing on all sides and basically you're pointing to. Bass and then the state comes back and says well bass was vacated and then I think in reply, you point out that it's up before the court, and the high court and Dossie and now we know that, you know, it's not anymore. You know, on this briefing. And this we issue, just something that we can properly address. You know, because I have concerns about addressing issue as weighty as this on such minimal briefing. Certainly, your honor, at the time we filed the original brief in 2021, we had the appellate court's decision this court's decision in bass and the PLA, the petition for leave to appeal had been taken by the Illinois Supreme Court. That portion of bass was subsequently vacated. Then the Supreme Court took the Dossie case that was subsequently dismissed because the Supreme Court could not come to a quorum. There are by my account that I am aware of at least five more petitions for leave to appeal pending. So, it is possible that the Supreme Court will again take up this issue. Otherwise, I would urge this court to follow another panel of this court in their decision in people versus Smith, which also found that an arrest premised on investigative investigative alert. I'm sorry is unconstitutional because the Chicago police policy of issuing investigative alerts instead of attaining obtaining warrants from a neutral magistrate violates the Illinois Constitution's warrant requirements. There are certainly several appellate court decisions on both sides, but if your honor is asking for additional briefing, if your honors consider the state supplemental brief, I would ask to be allowed to file a supplemental reply. The people versus Smith case that you just mentioned, when was that decided? That is a 2022 decision, your honor. Is that in the briefs? It is in the state's supplemental brief that they filed yesterday. Okay. I can look up the site if your honor. No, that's okay. Thank you. Certainly. If there. I'm sorry, I think your honor is muted. Still in this day and age, we still do that. Sorry, Justice Johnson, did you have any questions before we look this lawyer for class. I do not. Thank you. Go ahead. You still have time left, but I'm just taking your request to reserve the rest of the time if you want. That's exactly what I'd like to do. I'll stand on my briefs on the remaining issues. Thank you. Council. Afternoon again, your honors again, David is good for the people. With respect to issue two, I think this is a case where. Appellate deference to the trial courts factual and credibility findings should reach its apex because all confessions all Miranda issues, all interrogations and custody are subject to some. Require some fine tooth combing at times. And this is such a case where that's necessary. I think the standard play out where as here, in your view, where we're looking at the same. That's right. I know this court has has said that that is Cox most recently that this court has. De novo review when there's a videotape. I don't think that can be reconciled with long standing standards of view in the state, whether this court or the Illinois Supreme Court regarding factual determinations made at motion hearings at the trial level. Certainly, this court is free to do that. But I would, I would suggest that de novo review has been. Has been not preferred way of reviewing a trial courts judgments on these kinds of my new specific issues. I think we win under either standard, but I wanted to start out with that deferential review in case this court were so inclined to apply this case, which we think is not withstanding its prior decision on that point. I think we said it in Florence as well. It started in Florida. Correct. And it comes. I think that not having anything else to say during an interview. Is not the same thing as not wanting to talk anymore about the case. And that's what happened here with a closer reading of the transcript review of the video viewed under the circumstances in its proper context. An indication of the right to remain silent and not talk must be unambiguous and clear. It must be specific and a reluctance to talk to investigators. It's not always the same thing as a refusal to talk anymore whatsoever under any circumstances. So I think that this court's decision in Cox is actually instructive and provides a very good distinction in Cox. And again, my review of some of these cases is emblematic of how it's necessary under these kinds of issues to really look at what was said and what was responded to and how it was responded to. So in Cox, after discussing the case for I think under an hour, the defendant said. I've got. I don't want to answer any more questions, period. Because I can't help you. And I don't want to dig myself into. This court said that this was a clear and unambiguous indication of Miranda. Because it clearly showed that the defendant didn't wish to say anything that would incriminate himself and the protection against self-incrimination, of course, is the bedrock concern on which Miranda was based. This court's decision in Hernandez is a little different, but actually shows again that a clear and unambiguous indication of the right to remain silent can be discerned from the very language and circumstances of the interrogation. In Hernandez, right after being read his Miranda rights, his Miranda warnings, the officer asked, do you want to talk with us? And the defendant said, no, not anymore, not no more. And the interrogation after that point continued, this court said, well, right after being read his Miranda warnings, he said he didn't want to talk. And that was a clear and unambiguous indication, given the timing of his invocation and the circumstances of the interrogation up to that point. In People v. Brown, right after being Mirandized again, actually given his Miranda warnings, he was asked, okay, having been read those warnings, do you wish to talk to us now? And he said, no. And again, this court said, look, you can't continue to question somebody after they clearly and unambiguously invoked their rights to remain silent immediately after hearing the Miranda warnings. Now, that's not to say that a person cannot invoke Miranda during interrogation. We don't deny that at all. But that didn't happen here. After the first interrogation, as it ended, the defendant said, after having discussed his alibi, after having discussed the video surveillance showing that his alibi was pretty much nonsense. And after getting into some more of the details of the shooting, the defendant said, I don't have anything else to say. And in response to that, Detective Halloran said, okay, you want to take a break. That's no problem. You don't have anything else to say. That's all right. And the defendant said, I'd like a cigarette. Okay, we'll bring you a cigarette. They brought him a cigarette. Unlike the cases I just discussed, there was no clear and unambiguous indication of his right to stop all questioning. Reasonably construed against the backdrop of the interrogation and responses, Detective Halloran and the defendant's request for a cigarette, for instance. These are all little pieces. You're drawing the distinction between I don't have anything else to say and I don't want to answer any more questions. That's my point, Your Honor. Correct. I think in the cases that are cited by the defendant and this court's recent case in Cox, clearly what was conveyed to the investigators was, I don't want to talk to you anymore about anything because I don't want to incriminate myself. In this case, in contrast, the defendant's statements that he didn't wish to talk, he had nothing else to say, came in response to specific requests for information from the officers and didn't plainly or reasonably signal that the defendant wished to cease all discussions. But the cops left all three times in this case, correct? It was all three times, Your Honor. Yes. The first one was construed as a break. We'll take a break. You want to talk anymore? We'll take a break. That's how they go. That's what they do, right? And then they come back without re-mirandizing. They did not. They construed his reluctance to answer any more questions at that point as a reluctance to not answer questions about the alibi. And came back and said, they said, hey, you've had some time to think. We know you didn't want to talk about that. But I've got some other questions about some other topics if you'd like to answer. He did. He still didn't incriminate himself on that second interview. The third interview, pardon me, during the second interview, the detective said, so I got to ask, why this time? Why this day? Why this park? And the defendant at that point said, I want to talk. After that, the third interview, I'm sorry, the second interview stopped. And the defendant then on the third interview was sleeping actually when the detectives woke him and said, you want to talk now? We have some more questions for you. And the defendant's responses were not audible. So I think if you look at that third interview, there's really not a whole lot there that can guide the proper disposition in this case. There was an inaudible, incomprehensible response from him, and they left him alone at that point. So I guess the broad theme here is that a reluctance to answer questions about certain topics, a reluctance to not talk to the officers, isn't the same as an invocation or a statement that I will speak to you no longer about any subjects whatsoever. I think that the distinctions between the cases I've discussed are clear, if subtle, but clear enough to conclude that there was no Miranda violation in this case. And with respect to the harmless error argument, Your Honors, I do appreciate your granting of my motion. I know that the court is still withholding judgment on the timeliness of the arguments, and I want to apologize to the court and the counsel for the late breaking filing in that respect, which was completely unforeseen. Just very briefly, I'll mention that the prosecutor's closing argument in this respect is very telling about the emphasis they placed on the certain pieces of evidence in the prosecution's arsenal. The emphasis in closing focused in great part on the identifications. Let's talk for a minute about those identifications, okay? Yes, Your Honor. Only one person actually identified this defendant, correct? Only one of the students. That was the only identification, correct? There were different levels of certainty in the identifications, Your Honor, so I respectfully disagree. But there were students that said he looks similar, he looks like him, but I believe there was only one, and tell me if I'm wrong, one witness who said, yes, I can identify him, and that witness only was able to do that at trial. And in prior show-ups, line-ups, he said, again, he looks like him, I think it's him, but never made a positive identification profile. Is that inaccurate? And if so, tell me how. Sure, Your Honor. That would be Steven Abdul. He was the student witness, ABDUL. So, of the live eyewitness identifications conducted after defendant's arrest, his was the strongest. He said, I'm not 100% sure, but, you know, without saying I'm 100% sure that's the guy. And at trial, he did make a complete 100% identification in court. There were four other... The suggestion is made that between the investigation and trial, there was quite a bit of publicity about this case, and the defendant's picture was shown broadly, correct? It was a highly publicized case, Your Honor. I'm not sure that the defendant has pointed to anything in the record that would suggest that these witnesses had some sort of overwhelming, were overwhelmed by the media in this respect. I do understand the court's concern in that respect, but sticking to the record, I am unaware of any part of the record where that was ever shown to have happened. For all we know, these witnesses could have perhaps blanked out the news. I mean, it's just as feasible as what the defense is suggesting. That's all I'm saying. That's completely fair, but we still do have Abdul. As a person, I think he really could be said to have made an identification, not getting sure as time went on, which is always a little problematic under the bigger analysis. Sure, Your Honor. I get your concern. I guess I would say that his identification went from not nearly 100% certainty during the process to a trial that it was 100% certain. This is a solid identification. Now, the other IDs were tentative. Some were premised on such languages, similar characteristics. He looks like the guy who maybe was wearing a hat. But I think that that's to be expected in a case where you have seven or eight student eyewitnesses running from a scene. You're going to have varying degrees of identification. I think on balance, I think the cumulative effect of this is pretty powerful. And standing alone, Stephen Abdul's identification in court is, of course, on its own enough to contend. I'm not saying that's the only ID we had. There were others to lesser degrees of certainty, undoubtedly. Could you call it an ID if the person never says that was him? I mean, would you, in terms of analyzing it? I would say it's a follow-up. Sure, pardon me. I didn't mean to interrupt you. No, no, you're fine. But in terms of analyzing it under Biggers, it feels a little awkward to do that when it's not an ID. It's just somebody says, yeah, they look similar. I understand your concern, and I think that's something that would have to, again, defense counsel pressed this aggressively at trial and in his cross for cross, I'm sorry, and in closing that the eyewitnesses were tentative. They couched their identifications in terms such as similar to or kind of resemble. This was all in front of the jury and pressed aggressively at trial as part of the theory of the defense actually was that the case of state was based upon what appeared to be significant evidence. But a closer review was really quite weak. Eventually, the jury did convict. The jury was instructed on the Biggers factors. This is IP, I think, 3.15. I might not have that right, but I think it is. And I know that the defendants has has argued at some length that the biggest factors way against us, the state that is, but I and I, we did suggest in our opening brief in our response. Not the supplemental but our brief from a couple years ago that reapplying the biggest factors and new appeal really is intruding on the province of the jury with respect to a sufficiency analysis. And having been instructed on those same five factors, the jury was in the best position to determine whether they wait for against the defendant for against the state or some combination thereof. I just might know. I did a little research into this a little while ago and found that figures is actually not even a sufficiency case. It's an admission of evidence case based on reliability. And so somehow, in the last decades, it started, I think, in the 80s, Illinois court started to apply that in in referencing referencing those factors in assessing sufficient to the evidence. Now, I'm not saying that the court shouldn't. I'm just I'm just giving the court a little context on that same road. So I know exactly what you're talking about. So it's a little confusing what it is. And I know the courts are in the practice of doing this and I just wanted to. Well, I didn't file a review, but I think what our office wanted to say was that while these factors weigh in our favor here, it really isn't the right approach to a sufficiency question. The right approach is assuming that the identifications viewed in a lightness favorable prosecution versus were adequate to convict. The question is not, in contrast, whether in the court's independent judgment, these were reliable identifications such that they were sufficient to convict. And again, the bigger does go back to the 70s and just somehow got kind of glommed on to this efficiency analysis, at least in Illinois. And I did a little research. I don't think that this is a very common practice in other states. It's an Illinois thing for what it's worth. So the just segwaying back to the harmlessness on the issue, too. So the identifications are varying. We have a very good one. And if the court doesn't construe the others as per se identifications, I suggest that Stephen Abdul's identification is solid. And that the others viewed in total as a cumulative matter suggested for sure that more likely than not, this was the defendants. This was a defendant's role as beyond reasonable doubt when those IDs are looked at in view of the other evidence that included the three. I went three friends of defendant who testified for the grand jury under oath who gave statements to detectives and assistant state's attorneys and to disclaimed any threats, any promises, any abuse at the time. They did recant those. But as the court is aware. Impeachment by reference to grand jury testimony and prior statements is actually substantive evidence and came in in that manner. We have the defendant confessing to two of these gentlemen, I think, Tucker and Randolph at a at a game meeting, actually, where the topic was being discussed. And the defendant was quite angry that Williams had been running his mouth. And the third individual, I think, Finner. He was, I think I'm getting mixed up Finner and Tucker were at the meeting. Randolph and Finner were at the meeting where the defendant said, Williams, you got to stop running your mouth. And Tucker testified at the grand jury that in the defendant's vehicle after he was picked up about 10 minutes after the shooting, Williams gave them a rundown of what had just happened. And then the balance of evidence, your honors, viewed individually or as single entities might not seem to fit, but there are like puzzle pieces actually to bring everything together. Defendants, eyewitness Ronald Smith saw the white, he identified the white, a white Nissan as the car from which the shooter emerged and in which the shooter driver absconded. The white Nissan was through investigation and footwork was found to belong to the defendant's mother. Video surveillance showed that Finner and Tucker accurately described being picked up by the defendant about shortly westbound at the park, about 10 minutes after the shooting. The defendant was in the passenger seat, Williams was driving, just as these witnesses had said and just as the defendant confessed to in his statement to police. And just to round up the harmless error, the prosecution in its closing said that before it even got to the confession, I think that's just to back up where we are here is a harmless error with respect to the admission to confession. The prosecutor said in rebuttal, I'm sorry, in closing, you know, jurors, you could retire right now, based on what we've shown you, the eyewitness identification or identifications of varying degree, and the statements of the defendant's co-fellow gang members, the white Nissan, Ronald Evans, the surveillance footage, the cell phone tower records, you could retire right now and convict him for killing India Pendleton. We're going to also show you that he confessed, and for about two or three pages, the prosecutor then focused on that. So the question is like is a holistic question. And I'm not, this is different than weighing the evidence that properly admitted evidence. The question that I think this court should answer should focus on is whether or not the introduction of this evidence had some sort of deleterious effect or adverse effect on the jury's verdict. And our argument we suggest in our supplemental brief if the court does accept the argument for review that the prosecutor's closing argument shows that it was but one aspect of the state's case, that its primary focus was actually on the balance of other independent evidence, showing that the defendant committed this crime, and that its focus and emphasis on that other independent evidence would have blunted any potential risk that the admission of the confession tip scales in the people's favor. The scales were already tipped well enough. If the court has no further questions about the issue to. I'm happy to rest if the court has questions about any of the other issues I'm happy to address them. I'd like to address the investigative alert. Sure. Sure. Well the time this was brief the case on on file. Which was from this court, and in the interim mass was vacated by the Illinois Supreme Court. So, when we filed our opening brief in this matter. There was literally no precedent from any court in this from this district that I'm aware of, and there actually wasn't supporting the defendant's position that investigative alerts that probable cause based on investigative alerts is not enough under the state constitution. So at the time that this was being briefed on our side, there was no precedent suggesting that this was a problem. And that's why our brief focused on that aspect of it. Now since briefing concluded in this case. Last summer, this court decided people versus Smith, which pretty much readopted the reasoning and bass said hey, you know, you know bass is no longer good. It's been vacated. It's not law. We are going to reassess this and we're going to come to the same conclusion as bass. That's fair enough. I would also suggest though that the court look at the final decision, the final summation and mass did not rest on did not result in a new trial, that is, the court found that the error was harmless because the balance of other evidence which, in my opinion is actually weaker than the evidence in this case, or at least similar enough to was enough to forestall any suggestion of errors and I think that's a proper resolution here. We also made a good faith argument in our supplemental brief, or to entertain that we believe that that is another reasonable basis on which to affirm. And I am aware that Dossie has been dispensed with. And I, I'm sure that my able phone in here is is correct that there are other cases down that you know waiting. The card has no other questions I'm happy to rest. If the court has has more happy to entertain. Questions from anyone. Thank you. No, thank you. Thank you. I appreciate your time and again, I appreciate your patience with our late breaking motion that respect and I do hope the court is taking over cases for other people. Thank you so much. I do appreciate it. Thank you, counsel. I want to extend my apologies to counsel as well for the late motion in this respect. Thank you. I will ask you to address whether you do think there's been some forfeiture. Certainly, your honor, the state had several months in which to review the record and prepare its case, and under rule 341. H seven and I, the state absolutely forfeited their harmless error argument with respect to issue two and also the good faith exception argument with respect to issue six. Otherwise, I had three points to make in response. First of all, if not really know was unambiguous in people versus florist, then I ain't got nothing else to say. Got nothing else to say and I don't want to say nothing else about it is at least as unambiguous as that. And I would like to add that in the video the video shows a physical manifestation of no longer wanting to engage with the police, because in the video Mr word puts his head down and crosses his arms and refuses to future to engage anymore with the police there so there's a physical indication that he does not want to talk about anything. The state's position is simply untenable and it would require an individual to hold up their hand and say I formally invoke my right under the Fifth Amendment to remain silent and I no longer want to speak about anything else that your honor that you know detectives want to speak to me about, and that's simply not the law. Second, the student who I who claims to have 100% identification of Mr Ward at trial identification is not reliable because that is not how memory work memory does not improve with time memory instead gets filled in with post event information. Any Google search demons shows that that Mr Ward and Mr Williams is mugshots were plastered all over the news and all over social media, the witnesses themselves were brought into court through hallways thronged with massive media attention there was absolutely post event information, filling in that identification. And there's no surprise that the, the, the wild that the description of the descriptions varied as well as wildly as they did. This was a shooting, the students immediately ran away which is why we ended up with descriptions that went from five six to six to blue hoodie gray hoodie low haircut black skullcap baseball cap dreadlocks and khaki cargo pants jeans. These are all over the place we cannot, we simply cannot credit any of those identifications those tentative identifications. And third, the standard for it is, is not whether the introduction was deleterious. The standard is whether it was harmless beyond a reasonable doubt, and given the weaknesses in the rest of the state's case, the lack of other concrete evidence linking Mr Ward to this shooting. That simply cannot be the case. And so I asked that your honors reverse Mr words conviction and remain for a new trial at which his confession is not admissible. And if there are no other questions. I will stand on my briefs for the remainder of the issues. But, but I do ask to be allowed to file a supplemental reply if your honors are substantively planning to consider the state's supplemental brief. And any other questions. Thank you. No, thanks. Okay. Thank you. Thank you both for really well done briefs in this case and an excellent argument and we'll take the matter under advisement.